UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LAUREL G. PIERCE, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 1:10-cv-01451-SEB-MJD |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**Entry Discussing Complaint for Judicial Review**

Laurel G. Pierce ("Pierce") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. ' 301, *et seq.*

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

I. Background

Pierce applied for DIB and SSI on April 5, 2007, and June 1, 2007, respectively, alleging an onset date of March 18, 2006. Her applications were denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted, and a hearing was conducted on September 2, 2009. Pierce was present. She was not represented by counsel. Medical and other records were introduced into evidence. Pierce, a medical expert, and a vocational expert testified. The ALJ denied Pierce's applications on September 22, 2009. On September 11, 2010, the Appeals Council denied Pierce's request for review, making the ALJ's decision final. *See Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. ' 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

The ALJ=s decision included the following findings: (1) Pierce met the insured status requirements of the Act through December 31, 2009; (2) Pierce had not engaged in substantial gainful activity since March 18, 2006, the alleged onset date; (3) Pierce had the following severe impairments: carpal tunnel syndrome and low back pain; (4) Pierce did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Pierce had the residual functional capacity (ARFC@) to lift/carry and push/pull 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours a day, 2 hours at one time; stand 6 hours a day, 2 hours at one time; walk 6 hours a day, 2 hours at one time; frequently bend, crouch, drive, crawl, squat, stoop and use stairs and foot controls; never use ladders, ropes, or scaffolds; no limitations in reaching; no temperature, fumes, or humidity limitations; no repetitive grasping or gross or fine manipulation with the right hand; and this assessment is consistent with the ability to perform a range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a); (6) Pierce was unable to perform any past relevant work; (7) Pierce was born on December 8, 1975, and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date; (8) Pierce had at least a high school education and was able to communicate in English; (9) transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Pierce was Anot disabled,@ whether or not she had transferable job skills; and (10) considering Pierce's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that she could perform. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Pierce had not been under a Adisability@ as defined in the Act from March 18, 2006, through the date of the ALJ=s decision.

## II.  Discussion

### A.  Applicable Law

To be eligible for DIB and SSI, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §' 423(d)(1)(A); 1382c(a)(3)(A). To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. ' § 416.908; 404.1508.

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's RFC leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. ' 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five. *Id.* The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.* at 352.

The task a court faces in a case such as this is not to make a *de novo* determination of the plaintiff=s entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B.  Analysis

In this case, the ALJ concluded that although Pierce had severe impairments consisting of carpal tunnel syndrome and low back pain, she could perform a range of sedentary exertional work. Pierce argues that the ALJ=s decision is not supported by substantial evidence. Pierce has framed her request for a remand under both sentence six and sentence four of 42 U.S.C. § 405(g).

*Waiver of Counsel – Development of the Record*

The first issue to be considered relates to Pierce's *pro se* status. A claimant has a statutory right to representation during her dealings with the Social Security Administration. 42 U.S.C. § 406; 20 C.F.R. §§ 416.1500, 404.1700; *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir. 1991). At the hearing, the ALJ discussed Pierce's right to have representation, but the Commissioner acknowledges that the ALJ did not obtain from Pierce a valid waiver of counsel. This is because the ALJ did not provide Pierce with all of the required information about the possibility of having representation for free or on a contingency basis, as well as other limitations on counsel's fees.

Having concluded that there was not a valid waiver of counsel, the court must determine whether that circumstance requires a remand. A claimant is entitled to a

remand based on inadequate notice of the right to representation only if the ALJ did not develop a full and fair record, that is, if the ALJ failed to exercise his "duty scrupulously and conscientiously [to] probe into, inquire of and explore for all of the relevant facts…." *Binion,* 13 F.3d at 245. The ALJ satisfies his duty to fully and fairly develop the record "if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Id.* The burden to show that the ALJ adequately developed the record is on the Commissioner. *Id.*

Pierce argues that the record was not fully and properly developed by the ALJ. Pierce has submitted 26 pages of documents which the Commissioner concedes were not part of the record at the time of the hearing. Report to the Court, Sept. 23, 2012 [Docket 27]. The records at issue were created prior to the September 2, 2009, hearing. What is confusing to the court, however, is that it appears that the ALJ did have some, but not all, of those records before him. The ALJ references documents 1C/20 and 1C/22 as opinions of treating physician, Dr. Hensley, dated August 6, 2007 and September 5, 2007. (R. at 20). The parties do not mention this, and the transcript index includes no exhibits marked as "1C" or "C." Those two records are, however, contained in the 26 pages submitted by Pierce, but are marked "20" and "22," not "1C20" or "1C22." Based on these two pages alone, the transcript does not accurately reflect what was before the ALJ nor is the transcript complete.

Pierce also argues that other records are missing from the record. Specifically, she asserts that post operative surgical notes discussing the surgery on her left wrist and an MRI of her back showing a bulging disc at the L4,L5 pushing on the root nerve are not in the file. It is true that the record refers to Pierce having had surgery on her left wrist/arm on July 26, 2007, (R. at 405), but the operative reports from that surgery do not appear to be in the record. The operative report from the April 19, 2007, surgery on the right wrist is in the transcript, (R. at 308-309), but similar documentation of the left wrist surgery is not. Pierce also contends that some records from Johnson Memorial Hospital might not have been provided. On remand, the ALJ shall take care to obtain all of the relevant medical records.

In addition, Pierce argues that the ALJ failed to fully develop the record by discouraging Pierce from asking questions of the medical expert during the hearing. She asserts that the ALJ interrupted her efforts to cross-examine Dr. Fischer. (R. at 492-501). It is true that while Pierce tried to formulate her questions, the ALJ did not allow her to finish them. (R. at 495). The ALJ believed Pierce was merely making statements when Pierce said she had a "long question." (R. at 493). Pierce attempted several times to question the medical expert's opinion that her left wrist did not require restrictions when she had had surgery on both wrists, but the ALJ interrupted her. (R. at 494). To his credit, the ALJ did attempt to rephrase what he thought Pierce was trying to ask, but Pierce's contention that the ALJ prevented her from completing a thought is well taken. It is now apparent that the difficulty Pierce

had in trying to ask about the restrictions on her left wrist/arm was most likely exacerbated by the apparent omission of records relating to her surgery on the left wrist/arm.

The Commissioner has not met his burden of showing that the ALJ adequately developed the record. Accordingly, the court finds that this *pro se* case must be remanded because the record was not fully and fairly developed.

In a related argument, Pierce points to the fact that she submitted to the Appeals Council a 5 page summary of her treatment from treating physician Dr. Hensley, dated May 15, 2009. (R. at 8, 427-431). Although this document pre-dated the hearing, it was not viewed by the ALJ nor by the medical expert who testified at the hearing. The court need not resolve the parties' arguments as to whether the new evidence should be considered under the framework of a sentence six remand. Because the case is being remanded in part because of an incomplete record, the ALJ shall consider the May 15, 2009, report, as well as any other additional evidence submitted by Pierce on remand.

*Listing 11.14*

Pierce argues that her carpal tunnel syndrome satisfies Listing 11.14 at step three of the analysis. The possibility of not having complete records of the evaluations of and surgery performed on the left wrist/arm leaves in doubt the correctness of the ALJ's determination that Pierce "lacks the significant and persistent disorganization of motor function of two extremities resulting in sustained disturbance of gross and dexterous movements" to satisfy Listing 11.14. (R. at 17). Pierce argues that the records reveal that she has had diffuse bilateral wrist pain since age 15, when she fractured both wrists, later requiring surgical procedures in 2006 and 2007. *See* (R. at 270, 371, 400-10).

Another aspect of the ALJ's decision as to Listing 11.14 has to do with his view of Pierce's ability to perform daily activities. The ALJ rejected the treating physician's October 20, 2006, opinion that Pierce could not do bilateral gross or fine manipulation, in part, because Pierce could take care of personal hygiene, feed herself, prepare a simple meal, drive, and vacuum, mop and dust. (R. at 17). The ALJ concluded that "the evidence fails to support a finding that the claimant is incapable of performing fine and gross movements effectively to listing level severity." *Id.*

The ALJ's description of Pierce's daily activities is too generous. What Pierce actually stated at the hearing was that she did not groom herself every day because it tired her out. (R. at 468-69). She cooked using the microwave. (R. at 469). She did laundry "in sessions." (R. at 470). She testified that someone helped her with grocery shopping. (R. at 468-70). When asked whether she could mop, dust, and vacuum, she

replied, "[s]ort of." No clarification was sought as to what "sort of" meant. Pierce testified that she drove about once a week. (R. at 444). She described how difficult it was for her to drive because her hands throbbed and an aching pain went up through her forearm. (R. at 480-81). She testified also that her doctors had told her not to drive when she was taking her medications. (R. at 481). The ALJ's evaluation of Pierce's abilities to perform daily activities is not supported by substantial evidence. It is noted, also, that the medical expert did not offer an opinion as to whether Pierce's impairments satisfied Listing 11.14. (R. at 490).

The court agrees that substantial evidence does not support the ALJ's conclusion with regard to Listing 11.14. On remand, the ALJ shall review Listing 11.14 for carpal tunnel syndrome in light of the additional records relating to both of Pierce's arm/wrist surgeries and treatment combined with the difficulties Pierce experienced in performing tasks with both of her upper extremities.

*Treating Physicians*

Pierce also argues that the ALJ erred in evaluating the opinions of her treating physicians. In April of 2007, Pierce underwent a correctional osteotomy with iliac crest bone grafting, using bone harvested from her hip, and hardware inserted to secure the infrastructure of her right arm. The same surgery was performed on her left arm in July of 2007. (R. at 405). At the time of the hearing, it was anticipated that Pierce would need to have additional surgery to remove the hardware. (R. at 480).

Pierce contends that the ALJ erred in his evaluation of the treating physicians' opinions concerning the anticipated duration of her limitations. The ALJ noted that on August 5, 2007, internal medicine treating physician Dr. Hensley opined that Pierce would be unable to work for 3-4 years. (R. at 20, citing Ex. 1C20). The ALJ concluded that this opinion was not supported by the record. *Id.*

On September 5, 2007, treating surgeon Dr. Dellacqua stated that "[w]ith regarding return to work and restrictions, I cannot provide an opinion at the present time whether you will require long-term or permanent restrictions, and I believe at least one year from the date of the last surgery will be necessary to determine your final functional result." (R. at 403). The "last surgery" as of September 5, 2007, was the July 26, 2007, surgery on her left arm. The ALJ wrote, "Dr. Dale Dellacqua's opinion on September 5, 2007, that the claimant needed more than a year from last surgery to heal would carry more weight if there were subsequent treatment notes to support his allegations." (R. at 20). It is this critical assessment by the ALJ that is not supported by substantial evidence. To the extent "subsequent treatment notes" were not present at the time of the hearing, this was in large part because Pierce did not have insurance and lacked financial resources. Indeed, during the hearing, the

ALJ asked if additional surgeries were anticipated. (R. at 479). Pierce testified that Dr. Dellacqua had told her that the hardware devices that had been implanted would need to come out sometime if the bones fused properly. (R. at 480). When asked when the surgery might occur, Pierce testified that the surgeon would not see her because she did not have insurance. *Id.*

The ALJ stated that Pierce "did not follow up with her doctor after her osteotomy on the left as treatment records stop a few months later." (R. at 21). While it is true that treatment records stopped for the most part in 2007, the ALJ failed to consider the fact that Pierce could not pay for additional needed treatment. The ALJ improperly ignored the explanation that Pierce could not see the surgeon because she could not pay for additional surgeries. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("inability to pay…may excuse failure to pursue treatment"); *see also* Ruling 96-7p, 61 Fed.Reg. 34483, 34487 (July 2, 1996) ("[t]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). The ALJ's determination that Dr. Dellacqua's opinion lacked support because there were no subsequent treatment notes was not supported by substantial evidence.

This error also diminishes the support for the ALJ's credibility determination. When discussing "precipitating and aggravating factors" in relation to Pierce's credibility, the ALJ noted the fact that Pierce had been told she might need further surgery, but he merely noted that no surgery had been scheduled. (R. at 18). Again, the ALJ failed to recognize Pierce's inability to pay as an explanation for not having the surgery at that time. *Id.*

Hand surgeon Dr. Dellacqua opined on August 23, 2007, that Pierce was "significantly" restricted in her ability to lift, grasp, manipulate, crawl, climb, and drive. (R. at 410). He also opined that Pierce was "moderately" restricted in her ability to perform "normal housework." *Id.* Pierce points out that on September 5, 2007, Dr. Dellacqua acknowledged that her median nerve was in an abnormal position and the symptoms reached a point where the nerve was unable to be accommodated in normal activities of daily living. (R. at 403). The ALJ's only reference to these opinions is his notation that Dr. Dellacqua had indicated that Pierce had significant limitations in lifting and grasping at that time. (R. at 19). The ALJ failed to acknowledge all of the significant and moderate restrictions noted by the treating surgeon.

The ALJ only limited repetitive grasping or gross or fine manipulation with the right hand, not the left. This finding is not supported by substantial evidence. In

Dr. Dellacqua's August 23, 2007, report, he restricted Pierce's "use of hands, per Dr. Dellaqua's specialty." (R. at 410). Pierce was wearing wrist braces at the time of the hearing. Dr. Fischer, the medical expert, testified that the notes of Dr. Dellacqua did not support restrictions for the left extremity. (R. at 493-96). For the reasons having to do with the incomplete record, the ALJ's reliance on the opinion of Dr. Fischer is not supported by substantial evidence.

*Mental Impairment*

Pierce next argues that the ALJ erred in not giving appropriate consideration to Dr. Hensley's opinions concerning her mental impairment. The ALJ determined that her mental impairment was not severe. (R. at 16). Pierce asserts that her anxiety disorder was demonstrated by a steady decline in GAF scores. She points to her GAF scores as 75 in 2006, 65 in 2007, and 42 in 2009, findings that the ALJ acknowledged. (R. at 15-16). Pierce also points to Dr. Hensley's April 21, 2009, opinion that Pierce "has a personality disorder that may impair her forward progress to health." (Page 13 of 26 page supplement). Dr. Hensley further stated that Pierce had not had health insurance to have continuity in her treatment for her anxiety disorder. *Id.* at page 10.

The ALJ relied on the finding by state agency consultants that Pierce's mental impairment was not severe. (R. at 16). The state agency consultants, however, reviewed the record in October of 2007, (R. at 412, 426), before the more dramatic declines in her prognosis and GAF score were noted. The ALJ reasoned that a GAF of 65 was indicative of mild symptoms, that Pierce had not required any ongoing treatment or been hospitalized for a psychiatric impairment, and that the record did not indicate that her mental condition had deteriorated. (R. at 16). These conclusions ignore not only the mental health treatment of August 5, 2009 (GAF of 42), but Pierce's lack of insurance and financial ability to pay for counseling and other treatment. The court notes, too, that there is no mental health record of August 5, 2009, in the transcript, (which the ALJ references, R. at 16, as Ex. 1C9), or in the 26 page supplement submitted by Pierce. On remand, the ALJ shall reevaluate Pierce's mental impairment with the complete record.

In sum, in this case, the record was not fully and fairly developed. This error resulted in an omission of medical records, including those relating to the left wrist surgery and testing. This error also resulted in the medical expert not having those records to consider and he specifically opined that only the right wrist/arm was significantly impaired. In addition, although referenced by the ALJ, certain 2009 mental health treatment records are neither in the transcript nor in the 26 page supplement submitted by Pierce.

Additional errors require a sentence four remand because the court cannot trace the path of the ALJ=s reasoning. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (an ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that [he] considered the important evidence and . . . to enable us to trace the path of [his] reasoning.") (internal quotation omitted). The court requires that Aan ALJ build an accurate and logical bridge from the evidence to [his] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review.@ *Id.* (internal quotation omitted). First, the ALJ's decision that Pierce's impairments did not satisfy the criteria of Listing 11.14 is not supported by substantial evidence. Second, the ALJ failed to factor in Pierce's inability to afford prescribed treatment/surgery in a number of contexts. Those contexts include his rejection of the treating surgeon's opinion that Pierce would need more than a year to heal and his credibility finding that Pierce said she would need more surgery but no surgery had been scheduled. Third, the ALJ's finding that her mental health impairment was not severe is not supported by substantial evidence.

### III.   Conclusion

For the reasons discussed in this Entry, the ALJ's conclusions are tainted by legal error and not supported by substantial evidence and the court is required to **remand** the case to the ALJ for further consideration. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand). Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 03/27/2012

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana